ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 20-00104-CR-W-GAF |
| JUSTIN C. HERN, | |
| Defendant. | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

**1. The Parties.** The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Timothy A. Garrison, United States Attorney, and William A. Alford III, Assistant United States Attorney, and the defendant, Justin C. Hern ("the defendant"), represented by Katrina Y. Robertson.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2. **Defendant's Guilty Plea.** The defendant agrees to and hereby does plead guilty to Count Five of the Indictment charging him with a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), that is, the intentional distribution of five (5) grams or more of methamphetamine (actual). By entering into this plea agreement, the defendant admits that he knowingly committed this offense, and is in fact guilty of this offense.

3. **Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offense to which he is pleading guilty are as follows:

On March 15, 2016, Detective (Det.) Ron Doumitt with the Jackson County Drug Task Force (JCDTF), obtained information from a confidential informant (CI) that a subject by the name of Justin Hern was selling large amounts of methamphetamine in the Independence and Kansas City metro area. With this information, Det. Doumitt opened an investigation.

With the assistance of the CI, the JCDTF was able to introduce an Under Cover (UC) detective to Hern. Over a four-month period, the UC conducted six (6) total purchases of methamphetamine from Hern. The total amount purchased was over 60 grams of methamphetamine (gross weight). This factual basis identifies the purchases of methamphetamine as Controlled Buy A through Controlled Buy F. The factual basis for Controlled Buy E relates specifically to the elements of Count Five.

Below is a timeline of dates, locations and amounts purchased from Justin C. Hern by the JCDTF UC. All of the controlled purchases of methamphetamine to Hern were audio recorded with a clandestine listening device on the UC.

**Controlled Buy A**

On March 15, 2016, a CI, that was signed up with the JCDTF, contacted Justin Hern about purchasing 3.5 grams (a "ball") of methamphetamine. Hern told the CI that he "was good." Hern told the CI to meet him at the Fisca Gas Station, 8312 E. 23rd St. Kansas City, Missouri.

At approximately 1326 hours, the JCDTF UC drove the CI to the meet location, the Fisca Gas Station. While at the gas station, Hern asked the CI and UC to follow him. Hern stated that he needed to pick up the methamphetamine. Hern was occupying a red Chevy Blazer that was being driven by a white female, the Blazer was bearing Missouri license MK8-X3X.

At approximately 1330 hours, the vehicle Hern was occupying pulled in front of 1600 Cambridge Ave, Kansas City, Missouri. A white male exited the residence and walked towards the Chevy Blazer. The UC witnessed the unknown male pull something

2

from his left front pants pocket and then make contact with a female that was sitting in the rear passenger seat of the Blazer. Hern exited the Blazer and walked back to the UC and CI, who were sitting behind the Blazer waiting. Hern advised the UC and CI that "they are weighing it out now." The UC then witnessed Hern walk towards the Blazer and reach inside. Hern then proceeded back to the UC vehicle where he handed the CI a plastic baggie containing a crystal-like substance. The UC then handed the CI $120.00 of pre-recorded JCDTF funds. The CI then handed the $120.00 to Hern. The UC and CI then left the area.

A JCDTF detective conducted a field test on the suspected methamphetamine and it indicated positive result for the presence of methamphetamine.

At approximately 1400 hours, Det. Gutierrez arrived at JCDTF headquarters and photographed, logged, tested, weighed, and placed the property into evidence per JCDTF policy. The package had a gross weight of 4.7 grams. A forensic drug-testing laboratory later determined that the methamphetamine was 95% pure and weighed approximately 3.58 grams.

**Controlled Buy B**

On April 7, 2016, the UC called Hern and set up a methamphetamine transaction with Hern. Hern agreed to sell the UC seven (7) grams of methamphetamine for $200.00. Hern told the UC to meet him at the K-Mart parking lot at 24 HWY and M-291 in Independence, Missouri.

At approximately 1246 hours, the UC arrived at the prearranged meet location and then placed a call to Hern. Hern told the UC he would be arriving shortly. At approximately 1252 hours, Hern arrived as a passenger in a blue Chevrolet S-10. Hern exited the S-10 and entered the UC's vehicle. As soon as Hern entered the UC's vehicle, he dropped a clear plastic baggie that contained a clear crystal substance into the center console of the UC's vehicle. The UC then handed Hern $200 of pre-recorded U.S. currency. The UC asked Hern if he could obtain a handgun. In response, Hern said that he could and it usually costs $120.00. Hern advised the UC to text him the specifics on the firearm that he would like. Hern exited the UC's vehicle and left the area in the blue S-10.

A JCDTF detective conducted a field test on the methamphetamine and it had a positive result indicating the presence of methamphetamine.

At approximately 1330 hours, the UC arrived at the JCDTF headquarters and photographed, logged, tested, weighed, and placed the property into evidence per Jackson County Drug Task Force policy. The package had a gross weight of 7.79 grams. A forensic drug-testing laboratory later determined that the methamphetamine was 95% pure and weighed approximately 6.56 grams.

**Controlled Buy C**

On April 21, 2016, the UC contacted Hern in regards to purchasing a quarter ounce (7 grams) of methamphetamine for $200.00. Hern agreed to the transaction and asked the

3

UC to meet him at the Fisca Gas Station, located at 8312 E. 23rd Street, Kansas City, Missouri.

With the deal location agreed upon, the UC proceeded to the Fisca Gas Station. When the UC arrived, he placed a call to Hern telling him he had arrived at the gas station. Hern told the UC that he would be arriving in "two minutes." Approximately four minutes later a blue Mustang pulled into the gas station and pulled directly behind the UC's vehicle. Hern exited the front passenger seat and entered the UC's vehicle via the passenger side. Hern tossed a clear plastic baggie containing a crystal substance onto the center console at which point the UC handed Hern $200.00 of pre-recorded JCDTF funds. Hern exited the UC's vehicle and entered the gas station.

At approximately 1301 hours, a JCDTF detective conducted a field test and the suspected methamphetamine tested positive indicating a presence of methamphetamine.

At approximately 1330 hours, the UC arrived at JCDTF headquarters and photographed, logged, tested, weighed, and placed the property into evidence per JCDTF policy. The package had a gross weight of 7.1 grams. A forensic drug-testing laboratory later determined that the methamphetamine was 95% pure and weighed approximately 5.84 grams.

**Controlled Buy D**

On April 27, 2016, the UC contacted Hern in regards to purchasing a quarter ounce (7 grams) of methamphetamine for $200.00. Initially, Hern agreed to the sale and asked the UC to meet him at the Fisca Gas Station, located at 8312 E. 23rd. Street, Kansas City, Missouri. The UC spoke to Hern minutes later and Hern asked to change the deal location to the Adams Mark Hotel, 9103 E. 39th St., Kansas City, Missouri.

When the UC arrived at the Adams Mark Hotel, they noticed Hern standing in the parking lot. The UC pulled up to Hern and Hern entered the UC's vehicle. With Hern in the UC's vehicle, the UC asked Hern if he was able to purchase an additional 7 grams of methamphetamine. Hern displayed a plastic baggie containing a crystal substance and asked "you still want this one." To which the UC answered "yes." The UC handed Hern $200.00 of pre-recorded buy money and Hern responded by handing the UC the baggie with methamphetamine in it.

Later, a field test of the suspected methamphetamine resulted in a positive response indicating the presence of methamphetamine.

Surveillance followed Hern to Kansas City, Kansas, where he was dropped off at Bunny's Beauty Supply, 3748 State Ave, Kansas City, Kansas and entered the business. Hern was inside Bunny's for several minutes, until Detectives Burchfield and Beets witnessed Hern exit the business. Hern then walked to 3806 Washington Ave, Kansas City, Kansas, where he entered the residence.

The UC placed a call to Hern, to which Hern stated he "was good." Hern asked the UC to respond to 3748 State Ave. in Kansas City, Kansas. The UC agreed and proceeded

to the given address. The UC arrived at the 3748 State Ave. address at approximately 1525 hours. At 1528 hours, Detective Waterworth witnessed Hern leave the 3806 Washington address and walked to meet the UC. Hern located the UC's vehicle in the parking lot and entered via the passenger side of the UC's vehicle. Once Hern entered the UC's vehicle he handed the UC a clear plastic baggie that contained a clear crystal substance. The UC handed Hern $200.00 of US currency to complete the transaction. Hern made the statement to the UC that he had just "re-upped" and he went through his "main chick."

This additional suspected methamphetamine also field-tested positive for the presence of methamphetamine.

On April 28, 2016, at approximately 1100 hours, the UC retrieved the two clear plastic baggies containing the crystal-like substance and photographed, logged, tested, weighed, and placed the property into evidence. The package had a gross weight of 13.5 grams. A forensic drug-testing laboratory later tested one of the baggies of crystalline substance and determined that the methamphetamine was 100% pure and weighed approximately 4.93 grams.

**Count Five - Controlled Buy E**

On May 12, 2016, the UC made phone contact with Hern. The UC contacted Hern and asked if he could meet to purchase an ounce of methamphetamine. The UC told Hern that he wanted to meet in person so they did not have to speak over the phone. Hern agreed and asked the UC to meet him at K-Mart, located at 24 HWY and M-291, Independence, Missouri.

When the UC arrived at K-Mart, he noticed Hern standing outside of a blue Chevrolet S-10. The UC pulled up next to Hern who entered the UC's vehicle via the passenger side. The UC told Hern they would like to purchase an ounce of methamphetamine. Hern told the UC that it wasn't a problem and he could get it "now." Hern then instructed the UC to follow him to Raytown and informed the UC the ounce of meth would cost him $700.00.

Hern re-entered the blue S-10 and the left the K-Mart followed by the UC. Hern drove to the Pizza Hut, located at 10015 E. 67th St. Raytown, Missouri, within the Western District of Missouri. Hern entered the UC's vehicle and asked the UC for their money. The UC explained to Hern that he would not allow his money to leave their vehicle without the product. Hern advised he had enough money to buy one ounce, due to the fact he was going to purchase an ounce himself he simply wanted the UC's money so he could purchase two at the same time and get a discount. Hern stated he would pay for the first one and return with it at which point the UC could pay him back. Hern advised the UC that he did not want to be put in the position of possibly getting into a lot of trouble, due to the fact the source is pushing a "kilo" a day and that there is a lot of dope and money there, "the kind of stuff that puts you away for life."

Hern exited the UC's vehicle and re-entered the blue S-10. JCDTF surveillance followed Hern as he traveled down 67th St. and pulled onto Harris Ave., Raytown,

5

Missouri. Hern pulled into the driveway of 6722 Harris Ave. Surveillance set up in the area, and approximately 17 minutes later, surveillance witnessed Hern pull off of Harris Ave. and proceed back to the Pizza Hut, where the UC was waiting.

Hern entered the UC's vehicle and tossed a clear plastic baggie containing a crystal substance into the center console. The UC handed Hern $700 of pre-recorded JCDTF funds, completing the transaction. Hern advised the UC that his source also gave him a discount. Hern further advised that his friends "Larry and Alissa" were involved in a three-year investigation and they were recently indicted for guns and drugs. Hern further advised there was "no heat" on him at all. Hern told the UC that if they purchased a quarter pound at a time, it would be $500.00 an ounce, since he gets each ounce at a cost of $400.00 (meaning Hern gets $100 in profit per ounce sold).

The suspected methamphetamine field-tested positive for the presence of methamphetamine.

At approximately 1340 hours, the UC arrived at the JCDTF headquarters. The UC then photographed, logged, tested, weighed, and placed the property into evidence. The package had a gross weight of 30.3 grams. A forensic drug-testing laboratory later tested one of the baggies of crystalline substance and determined that the methamphetamine was 95% pure and weighed approximately 27.89 grams. Pursuant to this plea agreement, the defendant admits that on May 12, 2016, he intentionally distributed more than five (5) grams of methamphetamine (actual) to a UC within the Western District of Missouri.

**Controlled Buy F**

On June 2, 2016, the UC contacted Hern and requested to purchase a quarter ounce of methamphetamine. Hern agreed to the transaction, and asked the UC to meet him at QT, located at 6507 E. 87th St, Kansas City, Missouri in 30 minutes.

When the UC arrived at QT, they noticed Hern exit the QT and walk towards the UC's vehicle. Hern entered the passenger side of the UC's vehicle, Hern explained to the UC that he "couldn't get the weight like I wanted to and you wouldn't want to pay the price I would get it at." The UC asked Hern what had happened to "500 each." The UC was referring to Hern's previous quoted price of $500.00 per ounce of methamphetamine, if someone purchased four ounces at once. Hern stated: "She dropped out," referring to his previous source of supply not selling methamphetamine anymore. Hern then placed a clear plastic baggie containing a crystal-like substance on the center console of the UC's vehicle. The UC asked how much and Hern replied: "$150.00." Hern made the statement, "it was almost 6, I smoked a bowl out of it." The drug transaction took place at that time. Hern further stated that he had two "zips", referring to two ounces of methamphetamine, yesterday and that he forgot about.

Hern exited the UC's vehicle and left the QT parking lot. Later, a JCDTF detective conducted a field-test that resulted in a positive response indicating the presence of methamphetamine.

6

At approximately 1120 hours, the UC arrived at the JCDTF headquarters. The UC then photographed, logged, tested, weighed, and placed the property into evidence. The package had a gross weight of 5.9 grams. The results of forensic drug testing from a laboratory has yet to be received.

**In-custody Interview of Hern**

On August 18, 2016, law enforcement detained Hern and apprised him of his *Miranda* rights. Hern waived his rights and agreed to speak with investigators. During an interview that Det. Doumitt conducted, Hern admitted to selling methamphetamine, but attempted to minimize his involvement by making the statement that he sold it "here and there." Hern continued by saying he doesn't sell methamphetamine anymore and he never sold "big weight." When Det. Doumitt asked Hern how much meth he sold on a weekly basis, Hern replied by saying he wasn't sure and that it differed from week to week. Det. Doumitt asked Hern about the how much Hern made per sale. Hern replied that he does "tax" the methamphetamine, but again attempted to minimize it by saying, "it's a favor really."

4. **Use of Factual Admissions and Relevant Conduct.** The defendant acknowledges, understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the Indictment as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charge to which he is pleading guilty.

5. **Statutory Penalties.** The defendant understands that upon his plea of guilty to Count Five of the Indictment charging him with a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), that is, the intentional distribution of five (5) grams or more of methamphetamine (actual), the minimum penalty the Court may impose is not less than five (5) years' imprisonment, while maximum penalty the Court may impose is not more than forty (40) years of imprisonment, a $5,000,000.00 fine, not less than four (4) years of supervised release, an order of restitution, and a

7

$100 mandatory special assessment per felony count of conviction which must be paid in full at the time of sentencing. The defendant further understands that this offense is a Class B felony.

6. **Sentencing Procedures.** The defendant acknowledges, understands and agrees to the following:

    a. in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

    b. the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

    c. in addition to a sentence of imprisonment, the Court may impose a term of supervised release of at least four years;

    d. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

    e. any sentence of imprisonment imposed by the Court will not allow for parole;

    f. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

    g. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

7. **Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against defendant for any federal criminal offenses related to methamphetamine trafficking for which it has venue and which arose out of the defendant's conduct described above. Additionally, the United States Attorney for the Western District of Missouri agrees to dismiss Counts One through Four and Six at sentencing.

8

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

8. **Preparation of Presentence Report.** The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and

9

the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

9. **Withdrawal of Plea.** Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and its formal acceptance by the Court. In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible. However, after the plea has been formally accepted by the Court, the defendant may withdraw his plea of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal. The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

10. **Agreed Guidelines Applications.** With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

    a. The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

    b. The applicable Guidelines Manual is the one that took effect on November 1, 2018;

    c. The applicable Guidelines section for the offense of conviction is U.S.S.G. § 2D1.1(c)(6), which provides for a base offense level of 28 as the defendant distributed more than 35 grams of methamphetamine (actual), but less than 50 grams of methamphetamine (actual);

    d. The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently.

Therefore, he is entitled to a three-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines. The Government, at the time of sentencing, will file a motion with the Court to that effect, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty plea, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

  e. There is no agreement between the parties regarding the defendant's criminal history category. The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

  f. The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

  g. The United States agrees not to seek an upward departure from the Guidelines or a sentence outside the Guidelines range. The defendant may seek a downward variance or a downward departure from the Guidelines deemed applicable by the Court, to include requesting a sentence at the statutory minimum of five years' imprisonment. This agreement by the parties is not binding upon the Court or the United States Probation Office and the Court may impose any sentence authorized by law, including any sentence outside the applicable Guidelines range that is not "unreasonable";

  h. The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the Indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay;

  i. The defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement.

11. **Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

12. **Change in Guidelines Prior to Sentencing.** The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

13. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

   a. oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

   b. comment on the evidence supporting the charge in the Indictment;

   c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

   d. oppose any post-conviction motions for reduction of sentence, or other relief.

14. **Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

12

a. the right to plead not guilty and to persist in a plea of not guilty;

b. the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

c. the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

d. the right to confront and cross-examine the witnesses who testify against him;

e. the right to compel or subpoena witnesses to appear on his behalf; and

f. the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial. The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement. The defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

15. **Waiver of Appellate and Post-Conviction Rights.**

a. The defendant acknowledges, understands and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

b. The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence. An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence. However, if the United States exercises its right to appeal the sentence

13

imposed as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

16. **Financial Obligations.** By entering into this plea agreement, the defendant represents that he understands and agrees to the following financial obligations:

 a. The Court may order restitution to the victims of the offense to which the defendant is pleading guilty. The defendant agrees that the Court may order restitution in connection with the conduct charged in any counts of the Indictment which are to be dismissed and all other uncharged related criminal activity.

 b. The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

 c. The defendant will fully and truthfully disclose all assets and property in which he has any interest, or over which the defendant exercises control directly or indirectly, including assets and property held by a spouse, nominee or other third party. The defendant's disclosure obligations are ongoing, and are in force from the execution of this agreement until the defendant has satisfied the restitution order in full.

 d. Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that compliance with these requests will be taken into account when the United States makes a recommendation to the Court regarding the defendant's acceptance of responsibility.

 e. At the request of the USAO, the defendant agrees to undergo any polygraph examination the United States might choose to administer concerning the identification and recovery of substitute assets and restitution.

 f. The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

 g. The defendant understands that a Special Assessment will be imposed as part of the sentence in this case. The defendant promises to pay the Special Assessment of $100 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case. The

Case 4:20-cr-00104-GAF   Document 27   Filed 10/21/20   Page 14 of 17

defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

  h. The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2) evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations. Moreover, the defendant promises that he will make no such transfers in the future.

  i. In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars ($10,000.00) or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% (one hundred percent) of the value of any previously undisclosed assets. The defendant agrees not to contest any collection of such assets. In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

**17. Waiver of FOIA Request.** The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive, or to authorize any third party to request or receive, from any department or agency of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

**18. Waiver of Claim for Attorney's Fees.** The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

**19. Defendant's Breach of Plea Agreement.** If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the

15

defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement. The defendant, however, will remain bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

20. **Defendant's Representations.** The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel. The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement. The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter his plea of guilty.

21. **No Undisclosed Terms.** The United States and defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written

16

supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

22. **Standard of Interpretation.** The parties agree that, unless the constitutional implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings. The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

Timothy A. Garrison
United States Attorney

Dated: 10/21/2020

William A. Alford III
Assistant United States Attorney

I have consulted with my attorney and fully understand all of my rights with respect to the offenses charged in the Indictment. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this plea agreement and I voluntarily agree to it.

Dated: 10/21/20

Justin C. Hern
Defendant

I am Justin C. Hern's attorney. I have fully explained to him his rights with respect to the offenses charged in the Indictment. Further, I have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case. I have carefully reviewed every part of this plea agreement with him. To my knowledge, Justin C. Hern's decision to enter into this plea agreement is an informed and voluntary one.

Dated: 10-21-20

Katrina Y. Robertson
Attorney for Defendant

17